All right, the next case set for argument is 523-0565, Gaines v. Ciox Health Care. If the parties want to take their seats. The appellant is Mr. Potts. Yes, Your Honor. When you're ready, you may proceed. May it please the Court. The trial court erred when it denied Ciox's motion to compel arbitration. On de novo review, this Court should reverse and remand with instructions for the trial court to stay the case pending the completion of arbitration. One of Ciox's core functions is that it fulfills medical records requests. Ciox fulfills those requests on behalf of healthcare providers so that those providers can focus their resources on patient care. When a medical records request comes in, Ciox is charged with reviewing the scope of that request, identifying medical records that are responsive to the request, assembling those records because they may be coming from different sources, and then finally transmitting that back to the requester. The costs associated with that process are regulated by statute. Basically, there are two ways that Ciox will fulfill a medical records request by statute. First, there's the option whereby a requester can ask for mail delivery of those records. This involves printing off paper copies and sending it via postage. This usually involves a higher cost to the requester because of those per-copy fees that are set by statute as well as the cost of postage. As you can imagine, if you get a banker's box full of medical records, the costs are going to add up. Alternatively, if digital records are available, Ciox can fulfill the records request by transmitting those records digitally. Usually, this is going to actually result in a reduced rate for the requester. By statute, there's an approximately 50 percent discount associated with getting digital records instead of paper copy records. When there's a digital transmission of records, there's only an obligation on the health care provider to do a one-off. You can imagine putting it on a CD-ROM or some sort of other disc, sending it off in the mail, and then they're done with it. What Ciox has done is they've created a web-based portal, and that web-based portal creates a secure platform because we want medical records that are confidential and secure. It allows you to log into that portal so that you can continuously access copies of those digital records. Going back to that example of the CD-ROM, if a requester, whether you are an individual or an attorney, if you lose that CD-ROM, you would then have to initiate the process all over again. By creating that platform, however, what Ciox does is they actually store the records  and that's one of the services that Ciox provides to requesters as part of its platform. The plaintiff in this case, Mr. Gaines, is a lawyer, and he is a repeated user of that platform online by his own admission. If you read the briefing, you read his complaint, it is rife with statements that he repeatedly logs into the portal to access medical records. The reason that we're here today is because as a condition of being able to use Ciox's portal online, in January 2019, Mr. Gaines was required to self-register and agree to Ciox's online terms and conditions. Those online terms and conditions included the arbitration clause that's the subject of Ciox's motion. When Ciox moved to compel arbitration, there is a limited burden associated with that. The burden of proof is preponderance of the evidence and Ciox needed to show that a contract was formed. These are the three basic elements we're all familiar with, offer, acceptance, and consideration. The record below, and frankly, even before this court, shows that there are a bevy of admissions and sworn evidence that established that Ciox carried that burden. Carried which burden? It's burden of proof to show the formation of a contract, Your Honor. Okay, how many contracts were formed? So, there is a dispute in the record in terms of how many times Mr. Gaines claims that he re-agreed to that original contract. I think that this court really only needs to look to that original contract that was formed in January 2019 and there is no dispute in the evidentiary record on that issue. But when a contract is agreed to in January of 2019, the terms and conditions are not all together as I understand it. In other words, the arbitration, the piece that contains the arbitration clause, that has to be separately agreed to as I understand it. No, Your Honor. No. The arbitration clause is one of the paragraphs that's embedded within the terms and conditions. If you imagine a contract where you have paragraph 1, 2, 3, etc., I believe the arbitration clause is paragraph 16 of that contract. So, you don't have to separately click on a different paragraph or a different piece of the contract in order to agree to the arbitration clause. No, Your Honor. And that's not required by either the FAA or Illinois law. All right. Is this a browse wrap or a click wrap? This would be considered a click wrap, Your Honor. A browse wrap is typically considered where you are requiring on a hyperlink that's usually located either at the top of a website or the bottom of a website and that that hyperlink is going to be providing notice to a user of saying, you know, click here for the online terms and conditions. Here, he was presented with a specific webpage that had a scrollable box that's in the middle of it. You know, you can imagine kind of like this piece of paper that I have in front of me where there would be a square here where he could scroll through and read, as a lawyer, all the terms and conditions in there. And then at the bottom of that, there were two buttons that he had the option to select. He could select I accept or I decline. And he chose I accept. But if he chooses I accept, it's my understanding that somehow your client records that acceptance. So the existence of the acceptance is recorded, but it's not the traditional contract where there's going to be a printer at the other end of it that's going to spit off, you know, something that represents him clicking that button. It's something that's stored in the system that he accepted. Well, how do we know that he did it? Here's the easiest answer to say how we know he did it, is because there's no other way for him to use the platform unless he did it. Well, that's admission by a negative. You were able to produce a document by another law firm that showed acceptance of the contract, right? That was just an exemplar. That wasn't because we were looking. It was an exemplar, but that's my point. You were able to produce that somebody else had accepted the terms because it had the name of the law firm on it. Is that true? Your Honor, I don't even know actually that that was even used because it was a real law firm and that's how they did it. That could have just been an exemplar because they just said, you know, heading to the Roberts Law Firm, the Smith Law Firm, the John Doe Law Firm. Yeah, but there is a Brian Roberts Law Firm. Yeah. Oh. You've done more than that. What I can tell you is that isn't why it was selected. It wasn't that we were trying to find it. But that's what's in the record. Yeah. So I'm trying to get the answer to my question. Yes. My question is, can you produce anything that shows that Mr. Gaines accepted through his law firm the terms and conditions of this contract? To my knowledge, there is not a specific document to that, Your Honor, that we have. And there's nothing electronically? That in terms, I think they talked about things like IP addresses. That's not something that we produced either, Your Honor. But if I may, I want to push back a little bit on this by proving something by a negative. I think a really good example here, Your Honor, would be the difference between a taxi and an Uber. You know, there are a lot of different ways that you can get a taxi. You can walk out on the street and you can hail a taxi. You can call dispatch and order a taxi. Some of them may even have online platforms right now. An Uber, you can't walk into the street and order an Uber even if there's a sign on there. You can't call dispatch and get an Uber. The only way that you're able to use the Uber platform is because you have gone through this process where you have registered to have an account, inserted your credit card information, and then from there on you're allowed to order Ubers. And so really what's going on here is the only way that he's actually able to use this platform, which requires him to log in, he has to have a username, a password, and the only way for him to actually get there is because he did self-register in this process. Now, and also, Your Honor, what that says, the evidence, too, is also unrefuted that in January 2019 he self-registered. Mr. Gaines submitted an affidavit in response to it. What's notable about that affidavit is that at no place does he ever deny that he registered in 2019, as stated in our affidavit. What he said is, I disagree that when I continue to log into the platform in subsequent times that I continue to re-agree to the agreement. So that's why the evidence in front of the court is actually unrefuted, is that we have the statement from the sworn affidavit saying he did register in 2019. And I also want to direct the court to his own admissions in the complaint. In paragraphs 29 and 33 of the complaint, Mr. Gaines pleaded that as a condition of using that online portal, he was required to agree to the terms and conditions. Those are evidentiary admissions in the record by Mr. Gaines that he really can't get away from. Now, originally those started off as judicial admissions because that was the operative complaint. Later on, in the middle of oral argument, he asked if he could amend this complaint and insert by interlineation the word purported. The fact that that has gone from a judicial admission, which is binding under all circumstances, to an evidentiary admission doesn't change the result. The only thing that's relevant about it becoming an evidentiary admission is that it provides him with the opportunity to submit contrary evidence to counteract the effect of it. That means that he had the opportunity to say, I'm aware of what I said in the complaint. That was a mistake. I never actually breached those terms and conditions and do that under oath. He didn't do that. All that he tried to do was just de-elevate it, I guess, or de-escalate it from a judicial admission to an evidentiary admission. So it's really, the record is actually unrefuted on that point. In addition, if you read throughout the briefs, he says over and over again, I continue to use the online portal. He admits that Syox's arbitration clause applies to those instances in which he has used the online portal. So... Then why are we here? Because the trial court interviewed your Honor. Because this court is able to conduct a no vote review and look at these records, look at the complaint. But if the plaintiff has made these admissions, then I'm not sure what we're here for. I really think it is that simple, Your Honor. That's my honest answer. Below what happened is an oral argument. Plaintiff's counsel, first of all, it wasn't an evidentiary hearing. There were no witnesses placed on the stand. This was on the briefs and on the affidavits. And then there was a PowerPoint presentation that was presented to the court. Imagine if that was on the screen right there. Where plaintiff's counsel went through a walkthrough of how he personally used the platform in 2023. Now, we all know that the statements of counsel are not evidence. Also, the statements, you know, counsel's personal experiences are not the same as the experience of plaintiff. And also, we're talking about 2023 instead of 2019. Basically, it was a completely irrelevant discussion that occurred that wasn't even competent evidence. In the meantime, what happened after that is the trial court gave us the instruction, if you'd like, go file an additional affidavit, which is where we did, where we spelled it out in even more detail. And all there are about 37 paragraphs worth of information here that are establishing that we carry that burden of proof. And again, it's by a preponderance of the evidence. After we carried that burden, it was incumbent upon the plaintiff to counteract that evidence and beat it back. There was no evidence that was beating back anything that I just instructed to the court. There was nothing that actually denied that he entered into that contract in 2019. I want to shift quickly to some of the other topics because I see that my yellow light's on. So in that arbitration agreement, the parties agreed that they were going to be bound by the rules of the American Arbitration Association. It is virtually unanimous among courts within the United States, including this court and the Rotan case more recently. It's unpublished, but this court was also following that history. When parties incorporate the rules of the American Arbitration Association, that is considered a clear and unmistakable delegation of the question of arbitrability to the arbitrator. That's because it's in the rules. Yes. The AAA. Exactly, Your Honor. Which are not set forth in the arbitration agreement. They are not, Your Honor. Nevertheless, if you read the case law, all that is necessary is that when the parties say that they want to be bound by the rules, it incorporates that by reference. And that's what... There's not 100% unanimity. There's no unanimity on that. I do think I threw an adverb in there, Your Honor, where I said virtually. Yeah. But it's virtually unanimous throughout the country. And frankly, in my opponent's brief, they frankly don't really even challenge that fact, that that is the prevailing rule throughout the country. To be clear, though, I don't think that it's actually even a difficult decision. You know, I don't want to act like I'm trying to hide behind that rule. Because when you read this arbitration clause, it says that any and all claims against SIOCs, any and all claims that are related to the use of a SIOC service, those are going to be governed by the arbitration clause. It's really easy to interpret this and find it within the scope. I see my red light's on. I'll be happy to answer questions. I have another question for you. Yes. Why is this not a browse wrap? So... Or click. So what I want to say there is a browse wrap, is my traditional understanding, is where it's a hyperlink. Rather than clicking I accept or I decline. If you think about when you're on a website, there are a couple different things. Virtually any website you go on, let's say you wanted to order a Domino's pizza, they're going to have probably some sort of term and conditions at the bottom. And that is something that was done a little bit more towards the early edge of the internet. Now what happens is most companies have gotten a little bit more sophisticated about this. And you're either going to be clicking some sort of box that's a check box saying I accept, or you're going to be clicking a button, which is like what's here, where it says I accept. And that clicking, that click wrap, is the difference between the click wrap and the browse wrap. Now here I do think there's also a hyperlink, so it's really kind of a hybrid of the two, which is a bulked up version of a click wrap. But that's why there's not really that sort of issue. So in your particular website there's a button. And when you click the button, are you looking at all of the terms and conditions? Have you scrolled through all of the terms and conditions when you hit that button? Or does the button take you to the terms and conditions? The terms and conditions, if I go back to this, you can imagine that there's a scrollable box right here. And again, we have to remember, Mr. Gaines is an attorney. So we have a scrollable box right here where it has all of everything so you can scroll down through and do it and then click underneath. Okay, so the arbitration agreement, is there buried somewhere? Is there bold lettering? Is there a box around it? Is there something to highlight the fact that there's an arbitration agreement in this list of terms and conditions? So in the, I will go back and double check the picture in there. I know that on that first page, I'm trying to visualize in my mind, I know it says this is a valid binding contract. I'm trying to remember whether it says the word arbitration in that actual passage right there that's above the scrollable box. No matter what, though, there's no requirement that arbitration has to be singled out. And that's one of the issues that pops up frequently with the FAA is that you can't create heightened rules that concern agreeing to arbitration versus agreeing to any other term in that. Well, there's plenty of law about arbitration agreements being buried in terms and conditions. Yes, Your Honor. And what I would say is the Supreme Court has made it very clear in recent precedent that there's just no way that you can make special rules for arbitration specifically compared to anything where there is an integration clause, a non-assignment clause, the description of the consideration, anything like that. It has to be treated exactly the same as any other provision in the contract. It has to be treated legally the same. Yes. Yes. Okay. Question. Okay. Thank you. You have a few minutes after, Mr. King. Thank you. Mr. King, what say you? Counsel? May it please the Court. It's good to be back in Mount Vernon. I haven't been here in quite a while. We haven't either. Oh, really? We're glad to be back, too. Good to be here with you. The things that Mr. Propst just told you about the website and the process for entering into a relationship with SIOPS has very little in the record to support it. There's two declarations from one declarant, Mr. Jason Martin. Mr. Martin says in his first declaration that there are two ways one could sign up for eDelivery in January of 2019. Website that you've heard talked about here now and we've briefed. Enrollment form. That was Exhibit C to his first declaration. The enrollment form, which you can find in our supplemental appendix at page 16, doesn't require the enroller to assent to any terms. There's no mention of terms and conditions. Now, Mr. Martin says the enrollment method here is not at issue. But how does he know that? He doesn't tell us why it's not at issue. He doesn't tell us how he knows Mr. Gaines didn't use that enrollment form to enroll. We don't know how he concludes that Mr. Gaines had to have used the website to enroll in January of 2019. In fact, Mr. Martin tells us very little about how he knows most of what he says in his two declarations. He does say, however, that he knows what he talks about in his first declaration from reviewing quote, relevant records. That's paragraph three. His first declaration can be found in the appendix to the opening brief at page 68 of that appendix. He said those relevant records are attached here too. Well, let's talk about that. There are six documents between his two declarations. Two copies of terms and conditions, undated, unsigned. He doesn't tell us where they came from. There are two copies of AAA rules. One is irrelevant, and they provided the correct one in the second declaration. That's four of the documents. What are the other two? The enrollment form, Exhibit C that I was just talking about, and Exhibit B, which appears to be a screenshot of the scrollable screen that he was talking about. Was it demonstrated that that was scrollable? All the things that he just described? I don't know. You can look at it yourselves. Exhibit B in our supplemental appendix. And that's the one that refers to the Roberts Law Firm. And by the way, even that doesn't show acceptance. The box isn't checked. There's no indication that the I accept button was clicked. That exemplar doesn't establish even for the Roberts Law Firm that they accepted. Who knows who typed in the name of that law firm? So what we're really here about is the lack of foundation laid in the affidavit of someone who is a vice president, he says, of collections and billing at PsyOx, which I will point out is the opposite end of the transaction that people who are requesting medical records have with PsyOx. We're talking about how you sign up to use their web portal. He's from the department that comes after you when you don't pay or after you've received records, you get billing. How does he know? How does he know in January of 2019 what Mr. Gaines did? What does he know about Mr. Gaines? We don't even know if he worked at PsyOx in January of 2019. We don't know if he worked a day, a week, a month, a year, before he signed his declaration in April of 2023. We know nothing about this man, and he tells us nothing about how he learned what he says in his declaration, except for reviewing the documents attached to his affidavit, none of which, none, are in any way, shape, or form connected to my client.  That's why he doesn't come forward and say this, that, or the other thing, because we focused on, in this case, the failure of proof of PsyOx to prove that the parties entered into any kind of relationship, much less one that included an arbitration agreement. And their own evidence demonstrates the way that could have happened. Exhibit C, he could have enrolled using Exhibit C. There would have been no terms and conditions, and that's their evidence. So that's why the record is what the record is. In Mr. Gaines's declaration, he does say that when he goes in to get records, he's never asked even to look at terms and conditions, much less assent to them. That's why he submitted that affidavit. We submitted that affidavit because it corroborates my own experience, which I represented to the court, and I represent to this court, as an officer of the court. I went in and created on the website my own account, and it never required me to look at terms and conditions. I would contend that this is, you know, outside the record at this point. I would tell you that's a VASRAP agreement. If it was in January of 2019 a CLICRAP, well, we don't have any proof. There's no proof that this was, in fact, a CLICRAP website. And even if it was, there's no proof that that's the means by which Brent Gaines enrolled to receive eDelivery documents. And Mr. Martin submitted, as I mentioned, two declarations. Well, the second declaration came after we challenged his first, and we challenged their proof. But he has nothing to say about the fact that I pretty much called him untruthful, shall we say, in my presentation by saying, he says that every time you log in, you have to accept terms and conditions again. I didn't even have to look at them. He didn't address that. Mr. Gaines said the same thing in his declaration. He didn't address that. And if Mr. Martin is wrong about such a core factual point in his declaration, what else is not true there? And that's why I talk about the fact that he's a vice president in collections and billing. This is a data company, a multibillion-dollar data company with thousands of employees. And this man who works in collections and billing is the person they put forward to tell us how you enroll in their program? I mean, there's just simply no basis for assuming that he knows what he's talking about. I mean, if he were talking about something in collections and billing, that might be one thing, depending on what it is. It might be obvious how he knows what he knows. It's not at all obvious how he knows these things or why they selected someone like him. I guess because it's a case in which we're challenging their billing? I don't know. But I would have expected from a data company, and we're not saying that they were required to put somebody like that, an IT person, up to explain all this. We're just simply saying it's not very credible when it doesn't come from somebody like that, especially when they don't tell you how they know the declaration. Mr. King, talk to me about Exhibit B that has the Roberts law firm on it. Yes. You said that is a scrollable site? It looks like it probably is, but I don't know. Because all I have is one photocopied page of something that looks like things you see on the Internet, but it doesn't look like a Web page. It looks like something you would find on a Web page, but it doesn't appear to be a screenshot. And Mr. Martin doesn't say what it is? He says that's the screen that Mr. Gaines would necessarily have had to have come to, and in order to access electronic documents from Cyox, would have had to click on the accept button, check the box and click on the I accept button. That's what he says. In January of 2019? In January of 2019. Okay. But what about the subsequent acceptances by your client? What proof do they have that any of the subsequent acceptances would have had an arbitration agreement on it? No. There's nothing in the record on that. Okay. Their position is that it doesn't matter because he did it in January of 2019. So the fact that he doesn't do it every other time, that's not what Mr. Potts, I would imagine, I think maybe just did tell you that it doesn't matter because we got him in January of 2019. But the problem is – But every login is a separate transaction. Every login is – you log in. So you get a notice or an email. Somehow my client is notified that there are records available to him that he has requested. Right. And so then he goes in and logs into that. But one thing that – and it's relevant to one of the other points that I was going to make, in fact, in class, but maybe it's worth talking about here now. And Mr. Potts talked about it at the beginning. There's the old way of getting medical records. You send a letter to your doctor. The doctor sends you the medical records. Well, now these health care providers have started hiring companies like PsyOps to do that for them so they can practice medicine, get out of the document business. No problem. That still happens. There's some dispute about what percentage of the time it still happens, but Mr. Gates still gets a number of documents that way. He has no interaction with PsyOps in those – he does it the old-fashioned way. He sends all of his letters. He never requests documents from PsyOps. He always requests them from the health care provider, and sometimes PsyOps tells them, hey, they're available on the web, go get them, or they just show up in his mail. But they're from PsyOps. They're not from the provider. Well, PsyOps has obtained them from the provider and then provided them to Mr. Gates. My only point being that when he gets them the old-fashioned way, it has nothing to do with this web portal, nothing. And they have moved to stay in these proceedings under the Federal Arbitration Act, and Section 2, which appears at page 2 of their opening brief in full, says, let me just read it to you. A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction or the refusal to perform the whole or any part thereof or an agreement in writing to submit to arbitration an existing controversy, again, arising out of such contract, transaction, or refusal shall be valid. That's the arbitrations. You know, somewhat archaic language, but what's clear is that you have to have some sort of contractual relationship in the first place in which there is an arbitration provision. You can't just have a stand-alone arbitrate. Well, you can have a stand-alone arbitration provision. If I ever have a controversy with you, I won't sue you in court. I'll sue you in arbitration. You can have that, but Section 2 doesn't make that enforceable. That's the difference. So when it comes to these mail-delivered copies, at least that much of the case should stay in circuit court here because there's no contract at all between the parties. The only thing that SIOTS can point to there is the arbitration clause, but that means that with respect to the mail-delivered copies, this is just a stand-alone provision. Oh, I thought I was out of time. All right. Quickly, one other thing that I want to note for the Court is that in its required brief, SIOTS makes a waynear argument for the first time, and it says two things. First, that by filing his own declaration disputing Mr. Martin, that Mr. Gaines somehow admitted the sufficiency of Martin's declaration, and two, that the only proper way to have contested or challenged that declaration was by filing a motion to strike. Well, first, just let me say that if this appeal were to return on either of those points, it would be the height of elevating form over substance because the main thing that we did in the trial court was object to Mr. Martin's declarations and the lack of foundation for them. But in fact, the cases on which SIOTS relies, and this is a reply at pages 8 and 9, I believe, don't say what they say they say. They say you can't raise the sufficiency of an affidavit or declaration for the first time on appeal that you needed to file a motion to strike in the trial court, but it doesn't say you had to and the only way to challenge a declaration in the trial court is a motion to strike. And in fact, the last of the cases they cite on that is Barnett v. Snyder, 331 Ill Act III, 518 at 522 to 23, and it says, I quote, In Illinois, the general rule is the sufficiency of affidavits cannot be tested for the first time on appeal where no objection was made by a motion to strike or otherwise in the trial court. So the notion that we somehow waive the opportunity to contest Mr. Martin's affidavit declaration by filing our own declaration disputing him is wrong and it's not the law in Illinois and if the court has no further questions, I see my time is up. What's your response to the argument about the admissions? I had a feeling I was going to get a question about that. If you look at the complaint and those paragraphs that he cited too, not only did we, as we pointed out in the briefing, we said that in some paragraphs, Syops purported to do this or that. The paragraphs he's talking about are in the section of the complaint that are a challenge to whether or not there is a binding agreement between the parties. These are additional arguments. They're the kinds of arguments that would be addressed ultimately by an arbitrator because they go to the scope of the arbitration agreement and its enforceability. But it was in that context that we said that Syops requires users to assent to their terms and what we did at the hearing when that argument was raised for the first time, was immediately I said, Judge, look, my client is here contesting that he ever agreed to these terms. That's a lawyer's fault for the way that we drafted that complaint. They purport to require that, but there's no evidence that we didn't make the allegation that he did, in fact, assent to them. So, you know, that's what that is. Go ahead. Thank you, Your Honor. Mr. Potts? Thank you. If I could, I'm curious about Exhibit B, what you purport that to be from Mr. Martin. Exhibit B, I believe that's the exemplar. The scrollable site page that has the Roberts law firm on it. That's the one that I had asked you about earlier. Why do you submit that? It was just submitted as an exemplar. This is what the page looks like when it's presented to someone like Mr. Gaines when he's going on there. I mean, in retrospect, it could have had a blank in there or insert name, but it wasn't meant to convey that it says Mr. Roberts, you know, the Roberts law firm in there. It's just fill in the blank here. This is what it looks like. So what do you have that you've attached for your client that shows that Mr. Gaines ever consented on the website to these terms and conditions? What evidence? So the evidence that's in the record, number one, we have the evidentiary admissions that we were just discussing, and I can loop back to that discussion. Now you're talking about what plaintiff said in the complaint. I want to know what your client has brought forward to carry their burden of proof. In number two, we have statements saying that plaintiff went through the self-registration process online in January 2019. That's Appendix 76. And who says that? That is Mr. Martin. Okay. And that's the head of collections and billing. Yes. He has no IT background in his affidavit. I think that that is a complete red herring, respectfully, Your Honor, because this is something that is just a matter of. . . What's the basis for his knowledge? I think that this is really simple. As the person who's in charge of collections and billing, he knows how the contracts are formed that he is able to enforce. Okay. How do we know that? Does he say that in his affidavit? No, he doesn't say that specifically, Your Honor. He doesn't state his familiarity with the IT process or the formation of the contract? He identifies himself as the vice president of collections and billing. It states that he's familiar with the operations of the company. And what the standard is under Rule 191 is that he states that it is personal knowledge and there is a reasonable inference that he would be competent to testify about that at trial. What about the billing records, about the business records for which he is responsible? I think that there is a reasonable inference that he is going to be familiar. You have to remember, Your Honor, this is a core part of the business. This is not just something that is completely on the side. Well, I don't know that. I only know what I'm reading in the records, and so that's why I'm asking the questions. You agree that your client carries the burden of proof in this case? We carry the initial burden of proof, yes, Your Honor. But I would also say that if you refer to the complaint, they say that this is our core business as well. That's not just me saying that. I guess my question is, since you filed the affidavit, I'm trying to figure out what evidence you've brought forward that somehow shows Mr. Gaines consented to this arbitration agreement. We have the affidavit of a corporate officer, Mr. Martin, who says that based on his review of the records, Mr. Gaines agreed to be bound by this when he self-registered online because he would have had to click through this process. And do you agree with Mr. King that the only records that were attached to these two affidavits are the Exhibit B, which is the website, and Exhibit B, Enrollment Form, which was for the written documents? No, I don't agree that that was all. Okay, tell me what was attached. There were two copies of Terms and Conditions. There were AAA rules. Yes. What was attached that was particular to the website so that we know Mr. Gaines consented to the website? Specific to the website, it is Exhibit B, like we were just discussing. That's the Roberts Law Firm? The exemplar, Your Honor, yes. Does he say that's an exemplar? Yes, he does explicitly in the second declaration. He says it multiple times, and it's explained in the declaration through multiple paragraphs. Okay, and do you take the position that once you agree in January of 2019 that no matter how many times Mr. Gaines logs into this platform, that he doesn't have to continue to consent, that one and done kind of thing? No, Your Honor, and I'm glad you asked that. That's something where, if Mr. King is implying that Mr. Martin was engaging in untruthfulness there, that's actually something that we explain in the second declaration as well, and that starts at paragraph 14. And what he's referring to is the fact that what the contract says is that each time you continue to download records, you are again accepting these terms and conditions. Which terms? The terms and conditions that they remain the same the entire time, Your Honor. So from January 19 up through the time Mr. King did the display in court, they would have remained the same? Yes, and that's in the record as well. But the problem is when he did the PowerPoint in 2023, it didn't have the same terms and conditions that you were arguing about. No, that's not correct, Your Honor. Okay, tell me why that's not correct. What he's saying is that the platform's registration process was different and that it presented different screens to someone when they were registering. Mr. Martin says in his declaration that the terms and conditions are the same. That's one of the things that we were clarifying in that second declaration, Your Honor. Okay, and so you were able to – Mr. King would have been able to show that to the trial court, that there was an arbitration clause in there? If he wanted to, yes. And I think it might even be in the PowerPoint. I would have to go back and look, but yes. Okay, I'll take a look at that. Okay. Justice Katsany? Okay, thank you very much for your arguments. Thanks both of you to your arguments here today. The matter 523-0565, Gaines v. Syaks, will be taken under advisement. We'll issue a review court.